84

# CIRCUIT COURT OF THE CITY OF ALEXANDRIA

Labowitz,
Guardian

v.

Hirsch

November 10, 2005

Case No. CH04002627

BY JUDGE LISA B. KEMLER

After a bench trial, this Court took the above referenced matter under advisement. Upon consideration of the testimony presented, the exhibits introduced into evidence, and the legal authorities cited, I find that the Complainant should prevail on Count III of the Bill of Complaint based upon the following.

The Complainant, as the Guardian and Conservator for Dr. Ruth Jamison, filed suit against the Defendant, an attorney licensed to practice law in the State of Florida. The Defendant has never been licensed to practice law in Virginia. The Complaint sued the Defendant seeking an accounting pursuant to Virginia Code § 8.01-31 (Count I), discovery (Count II), and restitution in the amount of $21,200 plus attorney's fees and costs based upon breach of fiduciary duty (Count III), and unauthorized practice of law (Count IV).

The Complainant nonsuited Count II. As to Count I, subsequent to the trial, the Defendant filed an "Amended Accounting of Legal Services Rendered Ruth Jamison." As to Count IV, I have found no authority supporting a private cause of action for the unauthorized practice of law.

On April 29, 2003, on the advice of a mutual friend, Ann Kellogg, Dr. Jamison met with the Defendant and Ms. Kellogg at Clyde's, a restaurant in

Alexandria, Virginia. Though the Complainant argues that Dr. Jamison was suffering from signs of dementia or Alzheimer's at the time that she entered into an attorney-client relationship with the Defendant in the spring and early summer of 2003, I find that the evidence fails to establish that she was not competent to contract. According to Ms. Kellogg, Dr. Jamison wanted to obtain the advice of an attorney, but specifically did not want a Virginia attorney. Ms. Kellogg testified that, initially, Dr. Jamison discussed wanting to have a new will prepared and advice regarding her various financial accounts. (Kellogg Deposition at pp. 21-22.) This account is contrary to what the Defendant stated in a letter dated September 13, 2004, in which he stated that Dr. Jamison initially wanted him to help her with a possible claim against her homeowner's insurance company, Travelers Casualty and Surety Company. (*See* Hirsch Deposition Exhibit 6 and Complainant's Trial Exhibit 6.) According to the testimony of the Defendant and Ms. Kellogg, at the time the Defendant first met with Dr. Jamison on April 29, 2003, the Defendant told Dr. Jamison that he was not licensed to practice law in Virginia and that he could not practice in Virginia courts. According to Ms. Kellogg, the Defendant agreed to provide Dr. Jamison with legal representation and told her he would charge a fee of $300 per hour for his telephone time when he was in Florida and a separate fee of $5,000 to cover his expenses each time he came to Virginia to meet with her. (Kellogg Deposition at pp. 25-26, 100.) According to Ms. Kellogg, the $5,000 fee was intended to cover both the Defendant's airfare and time. (*Id.* at 101.) There was never any written agreement memorializing this fee arrangement. According to the Defendant, he came to Virginia three times to meet with Dr. Jamison, in April 2003, in December 2003, and in January 2004. Ms. Kellogg was only present at their first meeting on April 29, 2003.

In July 2003, Dr. Jamison entered into a written "Contract for Legal Representation." (Complainant's Exhibit 4.) Although the contract does not specifically identify the subject matter of the legal representation, based on the testimony and evidence presented, I find that the matter concerned Dr. Jamison's claim that personal property belonging to her had been stolen from her storage bin in the building where her condominium was located in Virginia. This contract contemplated a contingency fee arrangement and specifically states that "[t]here shall be no charge for attorney's fees of any kind incurred in the processing of this claim unless recovery is made. . . ." (*See* Complainant's Exhibit 4, page 1.) The contract thereafter sets forth a contingency fee schedule. Subsequently, the Defendant engaged in some telephone calls and correspondence on Dr. Jamison's behalf relating to the

86

alleged theft of personal property. Nothing ever came of the Defendant's representation of Dr. Jamison with respect to any insurance claim. There was neither a settlement nor any litigation.

The evidence presented established that Dr. Jamison paid the Defendant a total of $21,200 in three separate payments, $7,200 on September 17, 2003, $6,000 on November 20, 2003, and $8,000 on December 15, 2003. (*See* Complainant's Trial Exhibits 24, 45 and 48.) None of these payments correspond to the amounts billed in the invoices provided by the Defendant to Dr. Jamison. (*See* Complainant's Trial Exhibits 3 and 56.) As for the $6,000 payment (Complainant's Trial Exhibit 45), the Defendant testified that this payment was to cover his telephone time in connection with "being Ruth Jamison's lawyer," not necessarily in connection with the Travelers insurance claim. (Hirsch Deposition at pp. 78-79.) This testimony is in conflict with the letters exchanged between the Defendant and Keron Gannon which reflect that months after he had established his attorney-client relationship with Dr. Jamison in April 2003, and after Dr. Jamison had signed a contingency fee contract regarding the Travelers insurance matter, the Defendant claimed he and Dr. Jamison had negotiated a verbal agreement whereby she would pay him a flat fee of $6,000 to cover the time he spent on the telephone from "early July to the day *this case* ends." (*See* Complainant's Trial Exhibits 36 and 46.) (Emphasis added.) I find that "this case" referred to the Travelers insurance matter. In any event, other than the April 27, 2003, invoice (Complainant's Trial Exhibit 3), no evidence was presented documenting any of the time spent by the Defendant on the Travelers insurance claim or on any other matter on behalf of Dr. Jamison.

Regarding the Defendant's three trips to the Washington, D.C., area, the only documentary evidence presented are the Defendant's invoices for the April 2003 and January 2004 trips and a letter from the Defendant to Keron Gannon dated January 12, 2004. (Complainant's Trial Exhibits 3, 58, and 59.) With respect to the April 2003 invoice (Exhibit 3), the evidence established that the Defendant met with Dr. Jamison on April 29, 2003, at Clyde's restaurant in Alexandria, but no evidence was presented that he met with her or did anything on her behalf on any of the other dates reflected in this invoice. During his deposition, the Defendant admitted that he did not meet with Dr. Jamison on any of the other dates reflected on the invoice. He could not remember how much time he spent on Dr. Jamison's behalf other than on April 29th when they met for three to four hours. He testified that, on the other dates, April 27 and 28, he "thought about everything [they] had talked about." (Hirsch Deposition at 48.) Curiously, the invoice reflects charges for two

telephone calls on April 16, 2003, which would have been two weeks before the Defendant met Dr. Jamison for the first time and before she entered into an attorney-client relationship with him. In addition, both that invoice and the invoice for his January 2004 trip reflect more than the $5,000 flat fee Dr. Jamison had purportedly agreed to, as they show a "Legal Fee" of $5,000 plus expenses. These invoices contain little, if any, details as to what legal services he provided during the these trips to Virginia nor do they itemize the time he incurred either meeting with Dr. Jamison or doing other things in connection with his representation of her. No other credible evidence was presented documenting the time spent by the Defendant in connection with his representation of Dr. Jamison. Since he kept no notes or records of any meetings or communications with Dr. Jamison, there is no evidence other than what the Defendant says as to what services he provided or how much time he spent providing legal services to Dr. Jamison or consulting with Dr. Jamison on the telephone. Although there is correspondence that indicates the Defendant endeavored to represent Dr. Jamison with respect to her Travelers insurance claim and there was evidence presented that the Defendant accompanied Dr. Jamison on December 15, 2003, to Burke & Herbert Bank & Trust Company for the purpose of executing an irrevocable power of attorney, no evidence was presented showing how much time he spent on those matters and there is no evidence that he provided any other legal services. No evidence was presented with regard to what, if any, legal services he provided in connection with his January 2004 trip to Virginia or that such trip was even necessary. What is clear, however, is that the Defendant expended substantial efforts trying to obtain money from Dr. Jamison's accounts as well as berating, belittling, and threatening everyone and anyone whom he perceived as obstructing his efforts to have access to Dr. Jamison's accounts.

A Virginia resident is free to retain the services of a lawyer not licensed in Virginia but licensed in another jurisdiction. Such a lawyer may provide legal representation in Virginia to clients under limited circumstances. The Unauthorized Practice of Law Rules define "non-lawyer" as "any person, firm, association, or corporation not duly licensed or authorized to practice law in the Commonwealth of Virginia." (Unauthorized Practice Rules, Introduction, Section (C).) The Unauthorized Practice Rules delineate the conditions under which "foreign attorneys [may] provide legal advice or services in Virginia to clients." The conditions are as follows:

88

 (1) Such foreign attorney must be admitted to practice and in good standing in any state in the United States; and

 (2) The services provided must be on an occasional basis only and incidental to representation of a client whom the attorney represents elsewhere; and

 (3) The client must be informed that the attorney is not admitted in Virginia.

(Unauthorized Practice Rules, Introduction, Sections (C)(1), (2), and (3).)

The evidence presented proves that the defendant was admitted to practice law in the State of Florida. No evidence was presented that he was not a member in good standing of the Bar of the State of Florida. The evidence further proves that Dr. Jamison was informed that the Defendant was not admitted in Virginia. Regarding the services provided, though it is not clear from the evidence what legal services the Defendant actually provided, if the defendant is to be believed, the services he provided were more than on an occasional basis and were not in any way incidental to his representation of Dr. Jamison in Florida or elsewhere.

Based on the evidence presented, I find that the defendant entered into an attorney-client relationship with Dr. Jamison. This relationship is inherently a fiduciary relationship. "An attorney occupies toward his client a high position of trust and confidence, and in his relations with his client it is his duty to exercise and maintain the utmost good faith, integrity, fairness, and fidelity." *Byars v. Stone*, 186 Va. 518, 529, 42 S.E.2d 847 (1947). Although an attorney has a right to recover compensation from a client on whose behalf he renders legal services, included within an attorney's fiduciary duty to his client is the duty to charge a fair and reasonable fee for actual services performed. In addition, the services must be necessary. *Seyfarth, Shaw v. Lake Fairfax Seven, Ltd.*, 253 Va. 93, 96, 480 S.E.2d 471 (1997). When considering whether a fee is reasonable, a court may consider the "the time consumed, the effort expended, the nature of the services rendered, and other attending circumstances." *Mullins v. Richlands National Bank*, 241 Va. 447, 449, 403 S.E.2d 334 (1991). In addition, "contracts between attorney and client made after the [attorney-client] relation has been established are construed most strongly against the attorney and are regarded with suspicion and jealously and closely scrutinized by the courts." *Stiers v. Hall*, 170 Va. 569, 575-76, 197 S.E. 450 (1938). (Citations omitted.) The *Stiers* Court stated that "[t]here is a presumption of unfairness or invalidity attaching to a contract for compensation executed by an attorney and his client after the

establishment of the fiduciary relation." *Id*. at 576, quoting from *Note*, 19 A.L.R., p. 855. With regard to contracts made after the creation of the attorney-client relationship but before it has ended, "the attorney has the burden of proving that it is fair and reasonable, that it was entered into freely by the client and that the client was fully informed and understood the agreement." *Griffin v. Rainer*, 212 Va. 627, 630, 186 S.E.2d 10 (1972) (citations omitted).

While the Defendant may have been entitled to provide Dr. Jamison with general legal advice as to her financial affairs and to receive compensation for his time and expenses related thereto, the Travelers insurance claim and advice pertaining to the creation of a will were not matters incidental to the Defendant's representation of Dr. Jamison elsewhere. Even so, as to the Travelers insurance claim, Dr. Jamison agreed to pay the Defendant a contingency fee based upon a recovery. In light of the evidence concerning Dr. Jamison's declining mental and physical status after she entered into the attorney-client relationship, I find that any subsequent agreement to pay the Defendant $6,000 for telephone calls was neither fair and reasonable nor free from undue influence by the Defendant. The written contract specifically stated that there would be "no charge for attorney's fees *of any kind* incurred in the processing of [the insurance] claim." (Complainant's Trial Exhibit 4, emphasis added.) Viewing the evidence in its entirety, I find that the Defendant was not a credible witness regarding the legal services he provided and the legitimacy of the fees he charged. Though he apparently traveled to Virginia on three separate occasions to meet with Dr. Jamison, he has no notes of his meetings or other records detailing the time and effort he expended on Dr. Jamison's behalf to justify the fees charged. At his deposition, he had little recollection of these meetings. No explanation was presented for why each trip lasted four or five days and what exactly he did while he was in Virginia that related to his representation of Dr. Jamison. The first meeting on April 29, 2003, was corroborated by Ms. Kellogg, and Mr. Tomasino's testimony corroborates the fact that the Defendant was with Dr. Jamison in Virginia on December 15, 2003. No evidence was presented as to the purpose of or necessity for his January 2004 trip. As for the Defendant's "Amended Accounting of Legal Services Rendered Ruth Jamison," it provides no details from which I can conclude the fees charged were reasonable based on the time and effort expended. No evidence was presented that a $5,000 flat fee for a meeting that may have lasted three or four hours is a fee that is ordinarily charged in similar types of legal representation or that such a fee is reasonable and customary, nor was there any evidence presented concerning

the degree of complexity of the services rendered or that the services were necessary and appropriate.

Based on the foregoing, I find that the Defendant breached his fiduciary duty to Dr. Jamison by charging her exorbitant fees that are not justified by the time and effort he claims he expended on her behalf and by negotiating or attempting to negotiate a separate contract for fees after their attorney-client relationship had been established. Therefore, judgment is awarded in the Complainant's favor in the amount of $21,200 plus costs, less the following:

(1) $525.00 (cost of American Airline tickets for April 2003 and December 2003 trips);
(2) $84.64 (Clyde's Restaurant on April 29, 2003);
(3) One night lodging at the Holiday Inn in April 2003;
(4) One night lodging at the Holiday Inn in December 2003.

The Complainant has also requested attorney's fees. "[I]n the absence of a statute or contract to the contrary, a court may not award attorney's fees to the prevailing party." *Prospect Development Co. v. Bershader*, 258 Va. 75, 92, 515 S.E.2d 291 (1999). The exceptions to this rule include causes of action for malicious prosecution or false imprisonment and a suit for fraud. (See *Tauber v. Commonwealth*, 263 Va. 520, 546-47, 562 S.E.2d 118 (2002), quoting from *Prospect Development Co. v. Bershader*, at 92, in which the Court pointed out that, in *Prospect Development Co.*, "the evidence showed that the defendants engaged in 'callous, deliberate, deceitful acts,' which caused the plaintiffs to incur over $150,000 in attorneys' fees."). In addition, "a trustee who defends a suit against his trust may recover reasonable attorney's fees resulting from the suit" and "[a]n executor or administrator may recover from the estate the necessary expenses of defending a suit brought either to revoke the probate or test the validity of such will." *In re Klingenhagen*, 57 Va. Cir. 537 (2000) (citations omitted). In light of these authorities, the Complainant's request for attorney's fees is denied.